IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| ANDREW RICHARDSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 C 4824 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| CITY OF CHICAGO, Illinois, a municipal corporation, and Chicago Police Officers DARRIN MACON, TIM TATUM, RALPH HARPER, PHILLIP ORLANDO, WILLIAM MEISTER, PATRICK FORD, LEO SCHMITZ, and GLENN EVANS, | ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Andrew Richardson ("Richardson") sued the City of Chicago ("the City") and eight

members of its police department, Darrin Macon ("Officer Macon"), Tim Tatum ("Officer Tatum"),

Ralph Harper ("Officer Harper"), Phillip Orlando ("Sergeant Orlando"), William Meister ("Detective

Meister"), Patrick Ford ("Detective Ford"), Leo Schmitz ("Commander Schmitz"), and Glenn Evans

("Lieutenant Evans") (collectively "the Defendants") under 42 U.S.C. § 1983 for violations of his

civil rights. Specifically, Richardson alleges that: (1) Officer Macon engaged in excessive force

(Count I); (2) the police officers falsely arrested him (Count II); (3) the police officers conspired to

violate his constitutional rights (Count III); and (4) the City's widespread practice of failing to

discipline its police officers caused his injuries (Count IV). Richardson also brings related claims

under Illinois law, alleging that: (1) Officer Macon assaulted him (Count V); (2) all the Defendants

except Commander Schmitz and Lieutenant Evans falsely imprisoned him (Count VI); and (3) the

Defendants maliciously prosecuted him (Count VII). Finally, Richardson seeks indemnification from the City on his state law claims (Counts V, VI, and VII).

Officers Tatum and Harper, Sergeant Orlando, Detectives Meister and Ford, Commander Schmitz, and Lieutenant Evans (collectively "the On-Duty Officers") move for summary judgment on all claims asserted against them. The City moves for summary judgment on Counts IV. For the reasons stated below, the Court denies the On-Duty Officers' motion for summary judgment but grants the City's motion for summary judgment.

## STATEMENT OF FACTS[1]

### I. The Domestic Incident Between Officer Macon and Kim Scott.

On Friday, August 24, 2007, Richardson went on a date with a woman named Kim Scott ("Scott"). (Def. 56.1 Resp. ¶ 1.) Unbeknownst to Richardson, Scott had recently ended a tumultuous ten-year relationship with Officer Macon, a member of the Chicago Police Department ("the Police Department"). (*Id.*) After his date with Scott, Richardson drove Scott home and parked his red Pontiac Trans Am on the street in front of her apartment building. (*Id.* ¶ 2.)

Around midnight, Officer Macon, who was off duty and not in uniform that night, also arrived at Scott's apartment. (Pl. 56.1 Resp. ¶ 4; Def. 56.1 Resp. ¶ 2.) Officer Macon, who was driving a red Lincoln Navigator, pulled up in front of Scott's home and honked his horn several

---

[1]Throughout this Opinion, the Court refers to the Parties' Local Rule 56.1 Statements of Undisputed Material Fact as follows: citations to the exhibits to the On-Duty Officers' Statement of Uncontested Material Facts have been abbreviated to "Def. 56.1 Ex. __."; citations to the exhibits to Richardson's Additional Statement of Undisputed Material Facts have been abbreviated to "Pl. 56.1 Ex. ___."; citations to Richardson's Response to Defendants' Rule 56.1(a) Statement of Undisputed Material Facts have been abbreviated to "Pl. 56.1 Resp. ¶ __."; citations to the On-Duty Officers' Response to Richardson's Additional Statement of Undisputed Material Facts have been abbreviated to "Def. 56.1 Resp. ¶ __; citations to Richardson's Response to the City's Rule 56.1(a) Statement of Undisputed Material Facts have been abbreviated to "Pl. 56.1 City Resp. ¶ __."; citations to the City's Response to Richardson's Additional Statement of Undisputed Material Facts have been abbreviated to "City 56.1 Resp. ¶ __."

times before driving off again. (*Id*. ¶ 2.) As Richardson and Scott sat in Richardson's car talking, less than one minute later, Officer Macon returned and parked his Navigator alongside Richardson's car, blocking Richardson in and preventing him from driving away. (*Id*. ¶ 2.)

An argument between Scott and Officer Macon ensued, during which Officer Macon was verbally abusive toward Scott, while Scott repeatedly asked Officer Macon to stop harassing her and to leave. (*Id*. ¶ 3.) After several minutes, Richardson interrupted their argument and asked Officer Macon to move his car so Richardson could leave. (*Id*. ¶ 4.) When Officer Macon did not move his car, Richardson repeated his request at least five or six times. (*Id*.) At some point, Scott got out of Richardson's car and continued to argue with Officer Macon while she was standing at Officer Macon's passenger-side window. (*Id*.)

Richardson did not have a mobile phone with him that night, but he got a pen and paper from his car and told Officer Macon that he was going to get his license plate number and report him. (*Id*. ¶ 5.) When Richardson walked toward the back of Officer Macon's car, however, Officer Macon backed up, forcing Richardson to move out of the way to avoid being hit. (*Id*.) Richardson got back into his car, believing that he could get his car out, but as soon as he opened his driver's side door to get in, Officer Macon pulled his car forward again, blocking Richardson in. (*Id*. ¶ 6.) Richardson then walked to the driver's side door of Officer Macon's car and repeated his request that Officer Macon move. (*Id*.) Officer Macon responded that Richardson better go back and sit in his car and pointed what Richardson thought was a taser gun at him. (*Id*.)

At this point, Richardson went back to his car and got a baseball bat out of his backseat. (*Id*. ¶ 7.) In an attempt to get Officer Macon to let him leave, Richardson told Officer Macon that he would break out his windows if Officer Macon did not move his car. (*Id*.) Officer Macon then

threw a cup of soda at Scott, striking her in the face and spilling soda all over her, before driving off toward Cottage Grove Avenue. (*Id*. ¶ 8.) At no point did Richardson hit Macon's car or Macon's body with the baseball bat. (*Id*. ¶ 7; *see also* Pl. 56.1 Ex. B, Scott Dep. at 67:4-13.) As Macon drove away, Richardson told Scott he was going to follow Officer Macon and get his license plate number. (Def. 56.1 Resp. ¶ 8.)

## II.     The Shooting in the Target Parking Lot.

   Officer Macon drove two blocks on Cottage Grove and pulled into a large strip mall parking lot which included a Target store. (*Id*. ¶ 9.) Richardson followed him, trying to get close enough to see Officer Macon's license plate number. (*Id*.) During this time, Officer Macon dialed 911, identified himself as an off-duty police officer driving a red Navigator, and reported that a male in a red Trans Am was following him. (Pl. 56.1 Resp. ¶ 5; Def. 56.1 Resp. ¶ 13.) When the 911 dispatcher asked Officer Macon whether the man following him had a gun, he replied "Well, he threatened me and he pulled—he pulled a bat out . . . . No . . . he said he had one, he pulled out a bat." (Def. 56.1 Ex. A at 170:3-17; Pl. Ex. E at 2:25-2:30.)

   While Officer Macon was still on the phone with the 911 dispatcher, he and Richardson drove around the strip mall parking lot and then circled each other in the middle of the Target parking lot. (Def. 56.1 Resp. ¶ 10.) Officer Macon then pulled over, and Richardson was able to get his license plate number. (*Id*.) Richardson yelled out that he got Officer Macon's plate number and began to drive away. (*Id*.) At this point, Officer Macon got out of his car and, while still on the phone with the 911 dispatcher, he fired one round at Richardson with his service revolver. (*Id*. ¶¶ 11, 13.) When he fired his weapon, Officer Macon states he was about 35 to 45 feet away from

Richardson, who was still in his car. (*Id.* ¶ 11.) The bullet from Officer Macon's gun went through Richardson's driver-side door and lodged in the driver's seat. (*Id.*)

During his conversations with the 911 dispatcher, Officer Macon was unable to give her Richardson's license plate number and had difficulty giving any description of Richardson or his car. (*Id.* ¶ 13.) Officer Macon repeated the same phrases over and over to the dispatcher, who asked him for clarification several times. (*Id.*) Officer Macon also had trouble providing his location and direction of travel. (*Id.*) In response to a question from the dispatcher about the identity of the man following him, Officer Macon first denied knowing who he was, but then stated that Richardson had been "dealing" with his "ex." (Pl. Ex. E at 2:14-2:20.) At one point, Macon states that he's "pulling over now and going to just stay right here in this parking lot." (Def. 56.1 Resp. ¶ 13.) The tape captures the sound of Macon getting out of his truck (the car door makes a sound when it is opened) and Macon reports to the dispatcher that he is outside the car. (*Id.*) At that point, there is a loud sound on tape that is consistent with a gunshot, and Macon states something to the effect of "I done shot him." (Pl. Ex. E at 3:58-4:00.) Immediately after this statement, a police car's horn can be heard and Macon verifies that the officers have arrived on the scene. (Pl. Ex. E at 4:00-4:02.) Macon did not report to the dispatcher that he had been hit with a bat and did not report seeing Richardson with a gun. (Def. 56.1 Resp. ¶ 13.)

## III.    **The Police Response.**

Based on Officer Macon's 911 call, a police dispatcher from the Office of Emergency Management and Communications came over the police radio and stated: "Officer needs assistance at 87th and Cottage, Target lot, I've got an officer needs assistance, Officer Ma[c]on, a red Trans-Am is following him, the officer is in a red Navigator, caller says he was threatening to shoot him, its

some domestic over somebody's ex-girlfriend, 87th and Cottage, Target lot." (Pl. 56.1 Resp. ¶ 6.) Sergeant Orlando and Officers Tatum and Harper, as well as another officer named Covonia Jones ("Officer Jones"), were on duty and responded to the police dispatch. (Pl. 56.1 Resp. ¶¶ 3, 7; Def. 56.1 Resp. ¶¶ 14-15.)

Officer Jones called in on her police radio. (Def. 56.1 Resp. ¶ 14.) Officer Jones reported that she was at the scene and that she saw two cars going around the Target parking lot. (*Id.*) At that point, she was the only officer on the scene. (Def. 56.1 Resp. ¶ 15.) Over a minute later, other officers began to arrive, one of whom was Sergeant Orlando. (Pl. 56.1 Resp. ¶ 7; Def. 56.1 Resp. ¶ 15.) Sergeant Orlando arrived at the scene around the same time as a marked police car carrying uniformed officers. (Def. 56.1 Resp. ¶ 19; Macon Dep., Pl. 56.1 Ex. D at 270:6-271:20.) When he arrived at the scene, Sergeant Orlando saw Richardson driving a red Pontiac Trans Am and Officer Macon driving a red Lincoln Navigator. (Pl. 56.1 Resp. ¶ 8.) Sergeant Orlando testified that when he first saw the cars, they were moving and the Navigator was following the Trans Am, not the other way around. (Orlando Dep., Pl. Ex. H, 52:7-18.) When the police cars arrived, Richardson and Officer Macon both stopped and got out of their respective cars. (Pl. 56.1 Resp. ¶¶ 9-10.)

Some of what happened next is disputed. Richardson contends that as soon as the police arrived, he jumped out of his car and ran toward a marked police car that held two uniformed officers, whom he believes were Officers Tatum and Harper. (Richardson Dep., Pl. 56.1 Ex. A. at 130:4-7.) Richardson claims that he told the uniformed officers that Officer Macon had a gun, had shot at him, and was trying to kill him. (*Id*. at 130:8-14.) The On-Duty Officers, however, assert that Richardson's first contact with police officers was with Sergeant Orlando. (Def. 56.1 Ex. C at

67:17-68:5.)  Sergeant Orlando testified that as he approached Richardson, Richardson told him, while pointing at Officer Macon, "he's got a gun." (*Id.* at 68:2-5.)

The parties agree that when Sergeant Orlando approached Richardson and Officer Macon, he saw that Officer Macon was holding a gun. (Pl. 56.1 Resp. ¶ 10; Def. 56.1 Resp. ¶ 22.)  Sergeant Orlando pointed his gun at Officer Macon and told him to "Drop [his] fucking gun." (Pl. 56.1 Resp. ¶ 11.)  At this point, Officer Macon produced his police identification and told Sergeant Orlando that Richardson may have a gun and had threatened him. (*Id.* ¶ 13; Def. 56.1 Resp. ¶ 23.)[2]  As a result of his conversation with Officer Macon, Sergeant Orlando decided to handcuff Richardson. (Pl. 56.1 Resp. ¶ 13; Def. 56.1 Resp. ¶ 24.)

The parties dispute whether, at this point, Richardson was simply detained or was under arrest. (Orlando Dep., Def. 56.1 Ex. C at 80:22-81:6; Richardson Dep., Pl. 56.1 Ex. A at 132-135.) Richardson contends that immediately after speaking to Officer Macon, one of the officers walked back over to him and told him that he was under arrest for assault. (Richardson Dep., Pl. 56.1 Ex. A. at 133:2-134:134:8.)  Richardson testified that the officer handcuffed him, searched him, and placed him in the back of a police car. (*Id.* at 134:1-13.)  Sergeant Orlando testified, however, that Richardson was detained and not free to leave, but was not yet under arrest. (Orlando Dep., Def. 56.1 Ex. C at 70:6-7; 71:16-72:6; 80:20-81:6.)  Sergeant Orlando stated that he waited with

[2] Richardson disputes that Officer Macon originally told Sergeant Orlando that Richardson may have a gun or that Richardson had just threatened him. (Pl. 56.1 Resp. ¶ 13.)  However, he only cites Count III of his First Amended Complaint, Richardson argues that the On-Duty Officers and Officer Macon conspired to cover-up Officer Macon's use of excessive force by "tweaking" Officer Macon's version of events to justify Richardson's arrest. (*Id.*) Richardson does not provide any record evidence to dispute Sergeant Orlando's testimony that when he spoke to Officer Macon shortly after arriving at the scene, Officer Macon told him that Richardson may have a gun and had just threatened him. Accordingly, the Court deems this fact admitted.

Richardson outside the car for about one minute, when the other officers arrived. (*Id.* at 72:7-12; 74:11-75:5.)

Sergeant Orlando walked back over to Officer Macon, who was still standing by his car. (Pl. 56.1 Resp. ¶ 15.) Officer Macon told Sergeant Orlando that he had been in an altercation with Richardson at a different location where Richardson hit him with a bat and that Richardson followed him to the Target parking lot. (*Id.* ¶ 16.)[3] Officer Macon also told Sergeant Orlando that Richardson had reached down in his car and said, "I have a gun too," at which point Officer Macon identified himself as a police officer and fired a round at Richardson. (*Id.*)[4] At this point, Sergeant Orlando took possession of Officer Macon's firearm and told him to stay in his car. (*Id.* ¶¶ 17-18.) Sergeant Orlando then made the following notification over the police radio: "Looks like we're going to have shots fired by the police. Making an official notification." (*Id.* ¶ 18.)

Sergeant Orlando testified that it was not until after this conversation with Officer Macon that he went back to Richardson, told him he was under arrest, and Richardson was placed in the police car. (Orlando Dep., Def. 56.1 Ex. C at 85:16-86:4; 88:9-12.) Richardson was kept in the police car at the scene for over two hours. (Def. 56.1 Resp. ¶ 24.) Macon was not handcuffed or arrested. (Macon Dep., Pl. Ex. C, 158:13-16.)

## IV. Investigation At the Scene.

After learning that Officer Macon had fired his weapon, Sergeant Orlando notified his Watch Commander, Lieutenant Evans, who, along with Commander Schmitz and Detectives Ford and

---

[3]Again, without citing to any evidence, Richardson argues that Officer Macon did not actually make these allegations at the scene, but that the On-Duty Officers "tweak[ed]" Officer Macon's story to justify Richardson's arrest. For the reasons stated in note 2, however, the Court deems this fact admitted.

[4]*See* note 2 above.

Meister, arrived at the scene. (Pl. 56.1 Resp. ¶ 19.) Lieutenant Evans arrived after Sergeant Orlando had roped off the scene, about fifteen-to-twenty minutes after Sergeant Orlando arrived. (*Id*. ¶ 23.) Commander Schmitz arrived approximately one hour after Sergeant Orlando arrived, at which time Sergeant Orlando related the facts as he knew them to Commander Schmitz. (*Id*. ¶ 24.) Once Lieutenant Evans and Commander Schmitz arrived on the scene, they were in charge. (*Id*. ¶ 25.) When the forensic investigators arrived, Sergeant Orlando gave them Officer Macon's gun. (*Id*. ¶ 22.)

Once on the scene, Detectives Ford and Meister ("the detectives") spoke with Sergeant Orlando, Officers Tatum, Harper, and Macon, and the forensic investigators. (*Id*. ¶¶ 26, 28.) Sergeant Orlando told Detective Meister that he responded to the scene and that he had seen Richardson fleeing in a red Pontiac Trans Am, that Sergeant Orlando detained Richardson, and that Officer Macon told Sergeant Orlando that Richardson struck Officer Macon with a bat outside Scott's home. (*Id*. ¶ 27.)[5] Detectives Meister and Ford also spoke to Officer Macon, who told them that he got into a verbal altercation with Scott, that Richardson, who was with Scott that night, became angry and got a baseball bat from his car and struck Officer Macon in the eye with the bat. (*Id*. ¶ 29.)[6] Officer Macon told the detectives that he then drove away, but that Richardson followed him. (*Id*.) Officer Macon told the detectives that he then called 911 for help, drove to the Target parking lot and, after Richardson cut Officer Macon off, Officer Macon got out of his car with his gun drawn and announced that he was a police officer. (*Id*.) Finally, Officer Macon told the

---

[5]*See* note 2 above.

[6]*See* note 2 above.

detectives that when Richardson reached down into his car and said that he also had a gun, Officer Macon fired one shot at Richardson.  (*Id*.)

After speaking with the officers, Detective Meister interviewed witness Bobby Thompson, who had been eating at a restaurant around the corner from the Target lot during the incident, and Detective Ford interviewed Scott.  (*Id*. ¶¶ 30-31.)  Scott told Detective Ford that she had been arguing with Officer Macon outside her home.  (*Id*. ¶ 31.)  Although the parties dispute what exactly Scott told Detective Ford on the night of the incident, they agree that Scott told the detective that she did not see Richardson hit Officer Macon with a bat.  (*Id*. ¶ 31.)

Finally, Detectives Meister and Ford spoke to Elden Brooks, from Target's security department, and watched the video of Target's parking lot from earlier that night.  (Pl. 56.1 Resp. ¶ 33; Def. 56.1 Resp. ¶ 36.)  The detectives reported that none of the incident was viewable from the video recordings of the parking lot, so the detectives did not have a copy of the video made.  (Pl. 56.1 Resp. ¶ 33; Def. 56.1 Resp. ¶ 36.)

The On-Duty Officers never had Officer Macon take a breathalyzer test that night. (Def. 56.1 Resp. ¶ 28.)  The General Offense Case Report, dated August 25, 2007, at box 28, lists no injuries to Officer Macon.  (Def. 56.1 Ex. G.)  The On-Duty Officers admit that if there are visible injuries, taking photographs of those injuries is a requirement for completing an Officer's Battery Report. (Def. 56.1 Resp. ¶ 29.)  No photographs were ordered to be taken of Officer Macon's alleged injuries, even though forensic investigators were on the scene taking pictures of the vehicles.  (*Id*.) While he was in the back of the marked police car waiting for the officers to conduct the investigation, Richardson saw Officer Macon laughing and eating a sandwich.  (Def. 56.1 Resp. ¶ 28.)

## V.    **Investigation at the Police Station**.

Back at the police station, the On-Duty Officers consulted with each other and with Officer Macon in preparing their police reports.  (*Id*. ¶ 35.)  Officers Tatum and Harper, who were in one of the marked police cars on the scene, were assigned to complete some of the police reports, one of which was the General Offense Case Report.  (Pl. 56.1 Resp. ¶ 21.)  Officer Harper reported that there was an injury to the right side of Officer Macon's face, while Officer Tatum reported that there was an injury to the left side of Officer Macon's face.  (Def. 56.1 Resp. ¶ 35.)  No photographs were taken of Officer Macon's alleged injuries.  (*Id*. ¶ 29.)  Further, although Officer saw the cars going around in circles in the Target parking lot, neither Officer Jones's presence at the scene, nor her observations, are recorded in any report.  (*Id*. ¶¶ 15, 17.)

Detectives Meister and Ford interviewed Richardson at the police station and he had an opportunity to explain his side of the story.  (Pl. 56.1 Resp. ¶ 34.)  Richardson told the detectives that he knew, prior to the shooting, that Officer Macon was a police officer.  (*Id*. ¶ 35.)  He admitted that he removed a baseball bat from his car, threatened to break Officer Macon's car windows, and that he followed Officer Macon to the Target parking lot.  (*Id*. ¶ 35.)  Richardson denied ever striking Officer Macon with the bat.  (*Id*. ¶ 35.)

## VI.    **Charges Against Richardson.**

Despite Richardson's denials, Detectives Meister and Ford believed Officer Macon's statement was credible based on the totality of the circumstances, including the accounts of the other witnesses and the 911 tape.  (*Id*. ¶ 37.)[7]  Thus, upon sworn criminal complaints by Officer Macon and after consultation with Assistant State's Attorney O'Malley, Richardson was charged with

---

[7]*See supra* note 2.

misdemeanor aggravated assault and battery, to which he pleaded not guilty.  (*Id*. ¶ 39; Def. 56.1 Resp. ¶ 40.)  That same morning, Richardson was given an I-bond and was released from custody.  (Pl. 56.1 Resp. ¶ 36.)  In September 2007, Scott told Richardson's attorney that Richardson never struck Macon with a baseball bat.  (Def. 56.1 Resp. ¶ 39.)  After seven continuance dates, the case was stricken with leave to reinstate upon motion by the prosecutor in May 2008 (a *nolle prosequi* dismissal).  (Pl. 56.1 Resp ¶ 40; Def. 56.1 Resp. ¶ 40.)

## VII.    Discipline of Officer Macon

Commander Schmitz determined that Officer Macon's conduct on August 25, 2007 conformed with department policy and that it did not warrant an Office of Professional Standards ("OPS") investigation or a roundtable discussion.  (Def. 56.1 Resp. ¶ 33; City 56.1 Resp. ¶ 19.)  On August 26, 2007, Scott filed a complaint against Officer Macon including allegations against him from the night of the shooting and earlier physical abuse.  (City 56.1 Resp. ¶ 26.)  Scott was granted a plenary order of protection against Officer Macon and as part of the hearing, the judge heard evidence related to the incident at issue here.  (City 56.1 Resp. ¶ 26.)  Officer Macon was placed on forced medical leave after the incident.  (City 56.1 Resp. ¶ 13.)  While on medical leave, he was found unfit for duty at that time by a psychologist who interviewed him about his behavior on the night of the incident.  (City 56.1 Resp. ¶ 13.)

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In determining whether a genuine issue of fact exists, the Court must view the evidence

and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court, however, will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

## DISCUSSION

I.       **Counts II and VI:  False Arrest and False Imprisonment.**

In Count II of his First Amended Complaint, Richardson alleges that the On-Duty Officers falsely arrested him in violation of the Fourth Amendment, and in Count VI, he alleges that some of them falsely imprisoned him.[8]  The On-Duty Officers assert that they had probable cause to arrest Richardson, so they cannot be liable for false arrest and false imprisonment. *See Stokes v. Bd. of Educ.*, 599 F.3d 617, 626 (7th Cir. 2010) (noting that lack of probable cause is a common element for false arrest and false imprisonment claims). As an initial matter, because an individual can only

---

[8]Richardson also brought this claim against Officer Macon, Commander Schmitz and Lieutenant Evans, but Officer Macon has not moved for summary judgment and Count VI was dismissed as to Commander Schmitz and Lieutenant Evans as time-barred.  (*See* Doc. 101.)

be held liable under § 1983 if he "'caused or participated in an alleged constitutional deprivation[,]'" the Court must address whether each of the On-Duty Officers named in Count II took part in Richardson's arrest. *See Jenkins v. Keating*, 147 F.3d 577, 583 (7th Cir. 1998) (quoting *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir.1983) and noting "an individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation."). Here, it is undisputed that Detectives Ford and Meister, Commander Schmitz, and Lieutenant Evans did not arrive at the scene until after Richardson was arrested, searched, and placed in a police car. Once Richardson was arrested, or seized within the meaning of the Fourth Amendment, the constitutional violation had already taken place. *See Jenkins*, 147 F.3d at 583. Thus, because they did not "cause" or "participate in" Richardson's arrest, Detectives Ford and Meister, Commander Schmitz, and Lieutenant Evans cannot be liable for falsely arresting him. *See id*. (officer did not cause or participate in the plaintiff's arrest where the officer did not arrest the plaintiff, but "merely performed a ministerial act in signing the criminal complaint"); *see also*, *e.g.*, *Bass v. Hansen*, No. 09 C 1087, 2010 WL 5069690, at *7 (N.D. Ill. Dec. 7, 2010) (Aspen, J.) (granting summary judgment for the defendants who "learned of Plaintiff's arrest after it happened" and thus "were not personally involved in the alleged constitutional deprivation").

To prevail on his § 1983 false arrest claim against the remaining On-Duty Officers, Sergeant Orlando and Officers Tatum and Harper ("the arresting officers"), Richardson "must show that probable cause for his arrest was lacking." *Williams v. Rodriguez*, 509 F.3d 392, 398 (7th Cir. 2007) (citing *Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 1998)). A finding of probable cause to arrest "is an absolute defense to any claim under Section 1983 against police officers for wrongful arrest." *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006). "A police officer has probable cause

to arrest if a reasonable person would believe, based on the facts and circumstances known at the time, that a crime had been committed." *McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009). The Court assesses probable cause objectively by looking "at the conclusions that the arresting officer reasonably might have drawn from the information known to him rather than his subjective reasons for making the arrest." *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007).

Taking the facts in the light most favorable to Richardson, the Court can not conclude as a matter of law that the arresting officers had probable cause to arrest Richardson for aggravated assault and battery. For purposes of summary judgment, the Court assumes that Richardson was arrested—not merely detained, as the On-Duty Officers contend—at the time he was initially placed in handcuffs. To sustain a charge of aggravated assault in Illinois, the State must prove that: (1) the defendant, without lawful authority, engaged in conduct that placed another in reasonable apprehension of receiving a battery, and (2) in committing the assault, the defendant used a deadly weapon. 720 ILCS 5/12-2(a)(1). A battery occurs when a person "intentionally or knowingly without legal justification . . . (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3(a).

The On-Duty Defendants argue that they had probable cause in the form of information from credible source, namely Officer Macon, via his 911 call. However, this case is readily distinguishable from instances where the facts from scene corroborate the information provided to the officer by a dispatcher responding to a 911 call. *See, e.g.*, *Askew v. City of Chicago*, 440 F.3d 894, 897 (7th Cir. 2006) (finding probable cause where the information in the police dispatch was confirmed by most of the facts observed at the scene); *see also United States v. Young*, 38 F.3d 338,

341 (7th Cir. 1994) (a police "radio dispatch and the confluence of corroborative facts observed by the arresting officer" was sufficient to support a finding of probable cause).

At the time Richardson was initially placed in handcuffs, the arresting officers were aware of numerous facts at odds with what was relayed by the dispatcher from Officer Macon. First, from the police radio dispatch, the arresting officers knew that a police officer named Officer Macon, who was driving a red Navigator, had called 911 for help because someone driving a red Trans Am was following him and threatening to shoot him. Yet, at least one of the officers on the scene described the scene as opposite from what Macon told the dispatcher – he observed that the Trans Am was being followed by the Navigator. (Orlando Dep., Pl. Ex. H, 52:7-18.) Second, from what Macon told the dispatcher, the arresting officers knew that the parties were located in the Target parking lot and that there was some dispute over someone's ex-girlfriend. Yet, no details about what had occurred prior to their arrival at the parking lot were given. Third, upon arriving at the Target parking lot, the officers described that they observed the cars driving in the parking lot. It is undisputed that Macon's car was stopped when Macon fired the shot (Def. 56.1 Resp. ¶11; Macon Dep., Pl. Ex. C, 136:15-20); therefore, if the officers were on the scene when the cars were still driving, it is highly likely that they observed the shot fired by Macon. This is corroborated by the tape recording of the 911 call during which Macon can be heard telling the dispatcher that he fired the shot[9] and within seconds the sound of the police car horn can be heard. Yet, the officer who was one of the first on the scene, Officer Jones, when asked in her deposition about crucial details of the

_____

[9]The On-Duty Officers dispute that the "sound of a weapon being discharged is clearly audible on the recording." (Def. 56.1 Resp. ¶ 13.) However, the On-Duty Officers admit that Officer Macon fired at Richardson while on the phone with the dispatcher. (Def 56.1 Resp. ¶ 11.) The Court has listened to the 911 recording and concludes that there is a sound consistent with a gunshot and a statement from Macon to the effect of "I done shot him." Even if the On-Duty Officers eventually prevail with their version of the tape recording, that is an issue for a jury to decide and not one which can be decided as a matter of law.

incident in the Target parking lot, including whether she saw a shot fired, answered "I can't recall" or with an equivalent no less than two dozen times. (*See* Jones Dep., Pl. Ex. F.) Fourth, when Richardson emerged from the red Trans Am, he told two uniformed officers, presumably Officers Tatum and Harper, that Officer Macon had a gun, had shot at him, and was trying to kill him. This, of course, was easily corroborated by both the officers' observation of Macon with a gun in his hand and the bullet entry into Richardson's car. Yet, the officers credited Macon's version of the offense and not Richardson's. Fifth, although Macon said that Richardson had a gun, he did not, and no gun was recovered from Richardson on the scene. (*See* Def. Ex. G.) Sixth, although Macon told the officers that Richardson had hit him in the eye with a baseball bat, and there were no visible injuries to Macon's face in spite of what should have been a serious injury from such an attack. And finally, Officers Tatum and Harper's reports of injuries to Officer Macon were entirely inconsistent: Harper reported that Officer Macon had injuries on the right side of his face, but Tatum said the left side of Officer Macon's face had been injured.

Further, there is a genuine issue of fact that at least one officer, if not more, was on the scene when the shot was fired. Officer Jones and Sergeant Orlando testified that the cars were moving when they arrived and Sergeant Orlando's testified that Officer Macon was following Richardson, not the other way around. It is undisputed that Officer Macon's car had stopped when the shot was fired, so Macon's car must have stopped so that he could fire the shot at Richardson. It is also undisputed that Officer Macon's car door opened on the 911 tape, and the 911 tape has a noise that is consistent with a gunshot. This interpretation of the 911 tape is consistent with the undisputed fact that he fired the shot while on the phone with the 911 dispatcher. Finally, a police car can be heard

on the 911 tape arriving on the scene. These facts cut against the On-Duty Officers' arguments that they had probable cause to arrest Richardson.

Once the officers were on the scene, they had competing versions of what had occurred. They had Richardson's version (or first-hand knowledge) that Officer Macon shot at him, which was corroborated by Officer Macon's possession of the gun in the officers' presence and the bullet entry into Richardson's car. They had Officer Macon's version that he was being followed (disputed by at least one officer's version of what he observed when he arrived on the scene) and that he had been hit in the eye by Richardson with a baseball bat. Yet, Officer Macon had no visible injuries. Even though the facts on the scene called into question Officer Macon's version of the incident, the officers chose to credit the statement of the officer and they arrested Richardson and not Officer Macon. The significant number of disputed facts prevents this Court from concluding as a matter of law that the officers had probable cause to arrest and that issue must be tried to a jury.

## II. Count VI - Malicious Prosecution.

To prove malicious prosecution under Illinois law, a plaintiff must show: (1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff. *See Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996). If the plaintiff fails to prove even one of these five elements, he is barred from pursuing his claim. *See id.*

According to the Illinois Supreme Court, "a *nolle prosequi* dismissal terminates a proceeding in favor of the accused 'unless the abandonment is for reasons not indicative of the innocence of the accused.'" *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 925 (7th Cir. 2001) (quoting *Swick*, 662 N.E.2d

18

at 1242).  The circumstances where a *nolle prosequi* is not indicative of the innocence of the accused include "when the nolle prosequi is the result of an agreement or compromise with the accused, misconduct on the part of the accused for the purpose of preventing trial, mercy requested or accepted by the accused, the institution of new criminal proceedings, or the impossibility or impracticability of bringing the accused to trial."  *Id.* at 1243.  A *nolle prosequi* dismissal requires the that the Court examine the underlying facts to determine if the dismissal indicates innocence or not.  *See e.g., Treece v. Village of Naperville*, 903 F. Supp. 1251, 1258 (N.D. Ill. 1995).   Further, to prove a malicious prosecution claim against police officers, Richardson must show "more than a lack of probable cause; rather, he must allege that the officers committed some improper act after they arrested him without probable cause, for example, that they pressured or influenced the prosecutors to indict, made knowing misstatements to the prosecutor, testified untruthfully, or covered up exculpatory evidence."  *McDade v. Stacker*, 106 Fed. Appx. 471, 475 (7th Cir. 2004) (internal quotation omitted).

Here, it is undisputed that on May 30, 2008, upon a motion by the prosecutor, the court dismissed both charges against Richardson as *nolle prosequi*.  (Pl. 56.1 Resp. ¶ 40; Def. 56.1 Resp. ¶ 40.)   Richardson has produced evidence from which the Court may infer that the circumstances surrounding the dismissal are indicative of his innocence and that the On-Duty Officers are not entitled to summary judgment on this claim.  For instance, the original police report Officer Macon had no visible injuries even though he alleged he had been hit in the eye with a baseball bat, and the two arresting officers disagreed as to where Officer Macon was hurt.  Further, the only third party witness interviewed by police that could have witnessed the alleged bat attack, Scott, stated conclusively in her deposition that it did not occur.  Further, even if Richardson's prosecution failed

because Officer Macon failed to appear court, as the On-Duty Officers assert, that is not enough, standing alone, for the Court to grant summary judgment on Richardson's claim. It is reasonable to infer that Officer Macon did not appear because Richardson did not commit the crime. These facts, taken in the light most favorable to Richardson, are sufficient to indicate that Richardson's criminal case was dismissed because he was innocent of the charges.

As for malice, beyond the issue of the inconsistencies regarding documenting Macon's injuries, there is a genuine issue of fact as to whether the On-Duty Officers asked Scott whether Richardson hit Officer Macon and how she responded, and why the police reports do not address whether Scott witnessed a bat attack. In other words, there is a genuine issue as to whether the On-Duty Officers included exculpatory evidence in the police reports that supported the prosecution. It is undisputed that the bat attack, if it occurred, happened in front of Scott's residence, because Officer Macon can be heard on the 911 tape claiming he was attacked as he drove from Scott's residence to the Target parking lot. On the one hand, Detective Ford states that Scott told him that "She couldn't tell" if Richardson hit Officer Macon. (*See* Def. 56.1 Resp. ¶ 31 citing Ford Dep., Def. Ex. F, 63:0, 108:5-21.) On the other, Scott testified that Richardson never hit Macon with the bat that she provided the same account of the incident in front of her home to the detectives that she provided in her deposition. (Scott Dep., Pl. Ex. B, 31:6-14, 75:8-17, 77:7-10.) Richardson's malicious prosecution claim should proceed to a jury to resolve these factual disputes.

### III. Count III: Conspiracy to Violate Richardson's Constitutional Rights.

In Count III of his First Amended Complaint, Richardson alleges that the On-Duty Officers conspired with one another and Officer Macon to deprive Richardson of his civil rights. Specifically, Richardson contends that the On-Duty Officers conspired to falsely arrest him and to

cover-up Officer Macon's alleged misconduct.  To establish a claim for conspiracy under § 1983, Richardson must demonstrate:  (1) an express or implied agreement among the On-Duty Officers to deprive him of his constitutional rights, and (2) an overt act pursuant to and in furtherance of the agreement.  *See Scherer v. Balkema*, 840 F.2d 437, 441-42 (7th Cir. 1988).  Although a § 1983 conspiracy claim "certainly may be established by circumstantial evidence . . . such evidence cannot be speculative."  *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003).  Thus, to defeat the On-Duty Officers' motion for summary judgment on his § 1983 conspiracy claim, Richardson must demonstrate the existence of an agreement or acts "sufficient to raise the inference of mutual understanding" between the On-Duty Officers.  *Admunsen v. Chi. Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000).

Taking the facts in the light most favorable to Richardson, the Court finds that Richardson has raised the inference of mutual understanding between the On-Duty Officers to falsely arrest him.  First, it is undisputed that the On-Duty Officers and Officer Macon discussed their police reports with Macon before filing them.  Second, the On-Duty Officers descriptions' of Officer Mason's injuries are not consistent.  The General Offense Case Report, at box 28, lists no injuries to Officer Macon, even though he told the responding officers he was hit by a baseball bat.  Further, while Commander Schmitz and Lieutenant Evans were in charge of the scene and the investigation, no pictures were taken of Officer Macon, as is required when a victim has visible injuries.  Officers Tatum and Harper reported differently as to the location of Officer Macon's injuries, with Tatum reporting Macon had been hit on the right side of his face, and Harper reporting the left side.  The Case Supplementary Report, completed by Detective Meister and Detective Ford, however, lists "swelling to left eye" as Officer Macon's injuries.  That report does not reflect whether the police

21

detectives asked Scott whether Richardson hit Officer Macon with the bat, but Scott testified that she told the detectives the same story she told at her deposition, and Detective Ford testified that Scott couldn't confirm whether the attack occurred. This raises the inference that the reporting officers did not include this key information in their report on purpose. In sum, Richardson has raised a reasonable inference, at the summary judgment stage, that the On-Duty Officers had a mutual understanding to deprive him of his constitutional rights, and the conspiracy claim will be heard by a jury.

IV.     **Count IV: Monell Claim Against the City**.

        In Count IV, Richardson alleges that his injuries were proximately caused by the policies and practices of the City, which allows its police officers to violate the constitutional rights of its citizens without fear of any real punishment for such misconduct. The City cannot be held liable for a § 1983 violation under the doctrine of respondeat superior "for an injury inflicted solely by its employees or agents." *See Monell v. Dept. of Social Servs. of the City of N.Y.*, 436 U.S. 650, 694 (1978). Nevertheless, a plaintiff in a § 1983 case may sue the individual government actors that allegedly caused the constitutional violation as well as the municipality connected to the violation if the plaintiff establishes the unconstitutional act was caused by a municipal policy. *See Thomas v. Cook Cty. Sheriff's Dept.*, 604 F.3d 293, 302-05 (7th Cir. 2010). A plaintiff can establish a municipal policy in one of three ways, either by "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Roach v. City of Evansville*, 111 F.3d 544, 548 (7th Cir. 1997); *see also*

*Thomas*, 604 F.3d at 303. Here, Richardson claims that Officer Macon's use of excessive force against him was the result of a widespread practice by the City. Thus, to establish liability against the City, Richardson must prove that: (1) he suffered a deprivation of a federal right; (2) as a result of a widespread custom; that (3) was the proximate cause of his injury. *Ienco v. City of Chicago*, 286 F.3d 994, 998 (7th Cir. 2002).

To establish *Monell* liability based on evidence of inadequate training or failure to discipline, as Richardson seeks to do in this case, a plaintiff must also present proof of "deliberate indifference" on the part of the City. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Such proof can be evidence of either: (1) failure to provide adequate training in light of foreseeable consequences; or (2) failure to act in response to repeated complaints of constitutional violation by its officers. *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1029-30 (7th Cir. 2006). "Deliberate indifference requires more than a mere failure to eliminate a practice." *Johnson v. City of Chicago*, No. 05 C 6545, 2009 WL 1657547, at *9 (N.D. Ill. June 9, 2009) (citing *City of Canton*, 489 U.S. at 389 and *Wilson v. City of Chicago*, 6 F.3d 1233, 1240 (7th Cir. 1993)). Continuing to adhere to an approach, however, that policymakers "know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their actions—the 'deliberate indifference'—necessary to trigger municipal liability." *Bd. of Cty. Commissioners of Bryan Cty., Oakland v. Brown*, 520 U.S. 397, 407 (1997) ("If a program does not prevent constitutional violations, municipal decision-makers may eventually be put on notice that a new program is called for.").

Richardson admits that his *Monell* allegations rest on the following documents and deposition testimony. (Pl. 56.1 City Resp. ¶ 22.) First, Richardson relies on the individual Defendants' prior

complaint register histories, prior lawsuits against them, and their deposition testimony. Officer Macon has had over twenty complaints of misconduct filed against him during his employment as a City police officer, and in the past seven years, he has had six complaints filed against him. (City 56.1 Resp. ¶ 7.) In one case, the Chief Administrator of OPS recommended discipline, but the recommendation was overturned by the Chicago Police Superintendent. (*Id.* ¶ 10.) In another incident, the complaint was sustained and Officer Macon received a reprimand. (Id. ¶ 10.) Three of the complaints against Officer Macon made in the last five years took close to a year or more to complete. (*Id.* ¶ 11.) Commander Schmitz has a prior complaint against him in which he was investigated for allegations that he failed to ensure compliance with Police Department directives while members under his command were investigating a traffic crash involving an off-duty officer. (*Id.* ¶ 16.) While the Internal Affairs Division ("IAD") recommended that the complaint be sustained, the decision was ultimately overruled. (*Id.* ¶ 16.) Further, as of December 23, 2009, Commander Evans had two open complaints pending against him, arising from incidents that occurred on February 20, 2009 and August 13, 2009. (*Id.* ¶ 12.)

Second, Richardson relies on the Police Department report filed by Scott relating to the underlying incident and the complaint register relating to the underlying incident, some of which is outlined above. Third, he relies on the Police Department's 2001 Annual Report. The Police Department's annual reports document the number of complaints made against the City's police officers each year, as well as the rate of complaints that is sustained by the department. (*Id.* ¶ 1.) According to the 2001 Annual Report, OPS sustained approximately 6% of civilian complaints of excessive force it completed in 2001, and approximately 5% of the complaints it completed in 2002. (*Id.* ¶ 1.) In 2007, when the incident at issue here occurred, there were 1,615 investigations of

reported civil rights violations. (*Id.* ¶ 2.) Of the investigations completed in 2007, only eleven were sustained. (*Id.* ¶ 2.) Also in 2007, there were 2,448 excessive force complaints. Of the 1,575 excessive force investigations completed in 2007, 45 were sustained. (*Id.* ¶ 2.)

Fourth, Richardson relies on the Independent Police Review Authority's ("IPRA") 2007-2008 Annual Report, and fifth, he relies on the January 20, 2000 Resolution presented by William Beavers ("Beavers"), then-Chairman of the Committee on Police and Fire, in which Beavers recognized that "[Chicago] police officers who do not carry out their responsibilities in a professional manner have ample reason to believe that they will not be held accountable, even in instances of egregious misconduct." (*Id.* ¶ 3.)

According to Richardson, these documents and the Defendants' deposition testimony provide enough evidence to raise a genuine issue of material fact as to his *Monell* claim. Richardson has not provided enough evidence, however, that would allow a reasonable jury to conclude that the City had a widespread pattern or custom of failing to discipline its police officers or that the City was deliberately indifferent to its citizens' constitutional rights. Allegations of isolated acts of unconstitutional conduct committed by non-policymakers generally fail to demonstrate a widespread practice or custom. *See Sims v. Mulcahy*, 902 F.2d 524, 543-44 (7th Cir. 1990). Thus, Richardson cannot rely only on his allegations of wrongdoing by Officer Macon and the On-Duty Officers in this instance to survive summary judgment.

Further, mere evidence of statistics and complaint register allegations alone are not enough to support a *Monell* claim. *See Strauss v. City of Chicago*, 760 F.2d 765, 769 (7th Cir. 1985) (dismissing the plaintiff's *Monell* claim where the record was devoid of any evidence other than statistical summaries of complaints filed with the Police Department and stating that the number of

complaints alone "does not indicate that the policies that [the plaintiff] alleges exist do in fact exist and did contribute to his injury"); *see also*, *e.g.*, *Bryant v. Whalen*, 759 F. Supp. 410, 412 (N.D. Ill. 1991) (granting summary judgment for the City because "the fact that a low percentage of cases are ultimately sustained cannot in and itself be read to establish a policy of indifference."). Richardson points to a handful of cases from other judges in this district is which the court denied the City's motion for summary judgment on *Monell* claims like this one. Unlike those other cases, however, Richardson did not present expert testimony to opine on how the alleged lack of discipline affected the individual Defendants or other officers, nor did he present deposition testimony from anyone from the OPS or IPRA. *C.f. Johnson v. City of Chicago*, No. 05 C 6545, 2009 WL 1657547, at *10 (N.D. Ill. June 9, 2009) (plaintiff produced expert testimony as to the import of the officers' lack of knowledge of the law, as well as testimony from the individual defendants that they did not know the number or nature of the complaints lodged against them); *Arias v. Allegretti*, No. 05 C 5940, 2008 WL 191185, at *3 (N.D. Ill. Jan. 22, 2008) (plaintiffs retained an expert who reviewed four years of complaint register files and issued an opinion as to the City's failure to investigate these reports); *Garcia v. City of Chicago*, No. 01 C 8945, 2003 WL 1715621, at *6-7 (N.D. Ill. Mar. 20, 2003) (plaintiff provided the testimony of a IAD investigator, evidence that police officers knew the rates at which officers are disciplined, and expert testimony that concluded that "OPS investigations are not conducted to determine the truth of what happened, but rather to protect the image of the [Police Department]"). Richardson has not presented any evidence tending to show that the City promulgated policies or customs that allowed officers to violate individuals' rights, let alone that the City was deliberately indifferent.

Because Richardson has failed to present evidence tending to show that the City had a widespread practice or custom that allowed its officers to violate individuals' constitutional rights, the Court grants the City's Motion for Summary Judgment as to Count IV.

**V.     Counts VI and VII: Indemnification Claims Against the City.**

Finally, Richardson claims that the City is liable for the actions of its employees on the state law claims false imprisonment and malicious prosecution.  Because the Court has denied summary judgment for the On-Duty Officers as to those claims, the Court will not grant summary judgment to the City on those claims.  *See* 745 ILCS 10/9-102 ("A local public entity is empowered and directed to pay any tort judgment or settlement for compensatory damages . . . for which it or an employee while acting within the scope of his employment.")

<u>**CONCLUSION AND ORDER**</u>

For the reasons stated, the Court grants the On-Duty Officers' motion for summary judgment (Doc. 132) as to Counts II (False Arrest) and Count VI (False Imprisonment) as to defendants Detective Ford, Detective Meister, Commander Schmitz, and Lieutenant Evans.  The Court denies the On-Duty Officers' motion for summary judgment as to all the On-Duty Officers for Counts III, VI, and VII.  The Court grants the City's motion for Summary Judgment (Doc. 145) as to Count IV. Richardson's motion to strike or to seal exhibits (Doc. 138) is denied as moot.  The parties shall appear in Court on March 16, 2011 at 9:00 a.m. for a status hearing to set a trial date.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: March 10, 2011